February 25, 2012

The Honorable Judge Thomas Johnston, U.S. District Court, Southern District of West Virginia, 300
Virginia Street, East, Charleston, WV 25301

**FILED**

MAR - 2 2012

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

Re: CR 2:10-cr00160

Dear Judge Johnston:

In our prior Hearing you asked: Are the Contractor's Association contributions from workers?  The
question seemingly went unanswered and I respectfully offer the following reply:

Some unions and others argue that the Contractor paid Association dues are worker paid, because  the
unions add the contractor paid contributions in their self-reported prevailing wage submissions.  The
Contractor Association does not submit wage determinations, it only negotiates the wages and working
conditions.  The federal government does not accept any wage determination that has any amount
other than wages.  Thus, political action committee deductions from wages, labor-management
committee deductions, etc. are excluded from the federal wage determinations as non-wages.
However, the State of WV includes all deductions from wages and has an inflated prevailing wage
determination much higher per/hr. than the federal schedule.  The State of WV then mandates that
where any state funds are involved in federal construction projects, the higher wage schedule (state
prevailing wage) must be paid.  On purely federal funded projects, only the lower federal wage schedule
is followed.  So why did the union dominated and controlled State Department of Labor allow the higher
wage schedule to prevail?  So that union contractors and workers would not be underbid for
construction projects by non-union competition. Non-union contractors are not contractually required
nor would they ordinarily pay union deductions as a part of a total wage package. The Contractor
Association contract booklets all expressly state that Contractors (not workers) contribute and remit
Association dues. Please see attached sample of contract provision. The workers are not the source of
the Association dues.

Challenges to the WV wage determinations have been made, but unsuccessfully.  The challenges allege
that the wages are unreasonably escalated by the inclusion of non-wage fringes/deductions.  Ultimately,
the escalated wages create less funding for more critically needed infrastructure.  The price per/mile to
construct a WV interstate or highway averages $20 million, whereas the price per/mile constructed in a
non-union state such as North Carolina is $10 million with similar mountainous terrain.  The difference is
the wage and not the geography.

The merger of union-employee representatives now being seated upon the Contractors Association and
thereby controlling its bargaining for wage determinations will serve only to further inflate the worker's
wages.  I notified the U.S. Attorney's Office of the likely collusion that would result in a letter to AUSA
Steve Lowe and requested an investigation.  I also informed AUSA Lowe of a multi-million dollar bid

rigging scheme administered by the WV unions and new Contractors Association officers, whereby all were benefiting from the on-going scheme called "job targeting" and "market recovery." Within two months of my having blown the whistle on this illegal conduct, I became the subject of false allegations of prior mismanagement of the Contactors Association. When I met voluntarily with US Department of Labor Agents in August 2007 for the sole purpose of discussing and documenting allegations of Union and Construction Contractor Fraud, I was not informed that I was a target or subject of any allegations. However, instead of asking for details of the union/contractor illegal practices, the Agents appeared to only be interested in my activities over many years in administering the Contractors Association.

Over several decades, my late father and I steadfastly resisted attempts of union domination of the Contractors Association and its contract negotiations and grievance mediation resolutions. The funding for the Contractors Association was voluntary and cyclical. When the non-construction seasons and lean construction funding years occurred, the Association was near insolvent. My late father and I would personally defer salary and advance expenses to keep the Association operational and solvent. We believed that the Association had to remain independent from union control as required by the National Labor Relations Act. After my forced resignation the unions gained control of the 501-c-6 chartered business league, a violation of its independence and corporate standing. The Association is no longer a purely business league, like the Chamber of Commerce, solely promoting the best interests of its exclusive Employer-Management membership. The Association can no longer bargain independently "across the table" from union employees, since labor and management have become one. I have become the target of an unrelenting effort of false allegations and successive indictments of multiple counts of misconduct to discredit the concerns I have raised, while the new board and their union partners quietly raised labor rates over 9% after my resignation. Notwithstanding the unlimited resources of the government, I have ultimately defended that all allegations against me are spurious, but one, a charge that I allegedly and (unintentionally) violated a lending law, while the far more serious misconduct of union and contractor corruption goes unaddressed.

Basis for Motion To Dismiss Indictment

I stand before you, as an individual who never committed a criminal act, was nominated by President Bush to become a U.S. Marshal, and has raised a family with traditional values of integrity and strong religious belief. My daughter was a baby-sitter for AUSA Lowe, a tutor in math for AUSA Forbes son, trusted and unselfishly helping. I graduated law school with AUSA Robinson and mistakenly believed they knew or should have known that the Deutsch family was honorable, hard working and trusted. Notwithstanding, I sat helplessly as Department of Labor Agents stormed my family residence and held my daughter under threat of a gun carrying State Trooper at a kitchen table for 7 hours as they searched the residence for any evidence of a falsely alleged letter that purported to influence a potential witness. **No such evidence was ever found, nor any evidence of any wrongdoing**. Instead the Agents viewed and seized attorney-client files and computers, including my daughter's laptop that she needed to complete college assignments. Upon the conclusion of this unreasonable violation of the 4th Amendment, my daughter was so emotionally devastated that her grade point average fell from an A to a D. The U.S. Department of Labor Agents leading the investigation knowingly disregarded taint policies

requested by the U.S. Magistrate. Soon thereafter, with a Motion to Dismiss pending the government made a Plea Offer as follows:

The First Rejected Plea Offer

After the home invasion the government quickly offered a plea to drop all allegations in exchange for my accepting responsibility for having "fabricated and forged" a corporate resolution in obtaining a credit-line for the Contractors Association. (Please see attachment E**xhibit 1** titled first plea offer).  The government was immediately directed to look at their own investigative report and interview of the Bank President, wherein the Bank admitted their own former officers fabricated and forged the corporate resolution. (Please see attachment **Exhibit 2**).

The first plea was rejected and then followed by an amended plea offer that I admit to not having authority of two trustees of the Association" to bind" the organization when I shopped for  their loan. That is true, I did not have the formal approval of two trustees, but the custom and practice of the Association was to allow the administrative trustee to act in their behalf subject to ratification at a future board meeting.  The bank never asked if I had the formal approval and had they done so I would have said no, but I will obtain it.  The bank never asked before, during, or after the loan approval for a corporate resolution binding the Association to the loan.  Had the bank asked or provided their form, I would have complied.  The bank did not request this information, because they admittedly fabricated, falsified and forged the documents.  Please See Exhibit 2.

The loan was disclosed and posted upon the 990 (non-profit year-end tax filings) and approved by the board at its subsequent annual meetings. No board member ever objected over the next three years of the credit-loan reporting at line 64b of the 990's.   Only after I resigned three years later, did a new board decide that they would argue the loan was never authorized so they would discontinue the loan repayments.  So four years of investigation now comes down to the issue of a disputed loan to a financially struggling non-profit, a loan that could have continued in good standing had someone not made a civil matter a criminal allegation.  All the while, the actual wrongdoers, those at the Bank who fabricated and forged my name have gone unprosecuted.  How very odd that a victim is pursued for the crimes of the known and admitted criminal.

After my rejection of the first Plea Offer following the outrageous search of my residence, I was presented the second Plea Offer immediately following yet another superseding indictment.  The 2nd superseding indictment of March 2011, now falsely alleges that I used the Association funds to construct my residence.  At page 35 of the March 23, 2011 Grand Jury Transcript, a Department of Labor Agent (Wilburn) misleads the Grand Jury into believing that no construction loan was used to build the house. The Agent's testimony is negligently or deliberately false because a construction loan was used and with reasonable investigative diligence should have been discovered.  Attached, please find a copy of the construction loan that Agent Wilburn testified did not exist.  (Exhibit 3).  The Grand Jury was provided false testimony.

### The Second & Current Plea Offer

In conclusion, I respectfully request that the Court consider whether an omission, namely not having the formal two trustee indicia for the loan when it was obtained is a false statement subject to conviction as a violation of 18 U.S.C. 1014.  The United States Supreme Court in <u>Williams v. U.S.</u> appears to say that an **omission is not a false statement**.  Please see 458 U.S. 279.  The U.S. 4th Circuit in <u>Reass v. U.S.</u> likewise appears to say that a false statement must be "communicated" and cannot be inferred.  Please see 99 F2d 752. Further, the United State Supreme Court in <u>Dowling v. U.S.</u>, 473 U.S. 207 and citing <u>Williams v. U.S.</u> declared that **"Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate."**  Chief Justice Marshall said in <u>Dowling</u>:

**"The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals and on the plain principle that the power of punishment is vested in the legislature, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment. Thus, the Court has stressed repeatedly that when a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."**

The 4th Circuit Court of Appeals in <u>U.S. v. Carlisle</u>, 693 F.2d 322 cited <u>Williams</u> and reversed a District Court finding that a defendant had fraudulently induced a bank to extend credit with an omission. <u>Carlisle</u> stands for the 4th Circuit's affirmation that criminal statutes must be "strictly construed."  An omission is not a false statement for purposes of a 18 U.S.C. 1014 violation.  Since Congress did not expressly define nor include an omission as a violation of 18 U.S.C. 1014, I respectfully request the Court to determine if the Plea is appropriate as a matter of law before deciding whether conviction should follow.

If the Court finds that an omission is not a violation of 18 U.S.C. 1014, I respectfully request that the Plea presently before this honorable Court be withdrawn and that Defendant's Motion to Dismiss be reinstated.

### Request For Appointment of Special and Independent Prosecutor

The Defendant also requests that an independent prosecutor be appointed to investigate the numerous questionable tactics of the prosecution and their U.S. Department of Labor investigators throughout the course of this now four year process.  The Court's attention is called to the use of three successive indictments suggesting the prosecution was **"making it up as they went along"** and changing the manner and means as the basis for their allegations.  Please consider that the initial indictment falsely

alleged a $750,000 misapplication of funds, a forgery, etc.. The first superseding indictment removed
the entire dollar loss, the forgery count, and other spurious allegations. The Court is asked to investigate
the basis of the forgery allegation of the first sensationalized and widely published indictment. The
forgery allegation is particularly revealing of investigative and prosecutorial misconduct when the
government hand writing expert could not confirm the allegation and a lead government witness
attempted to recant her Grand Jury testimony. The Court is also asked to determine why the Grand Jury
Court Reporter, Debbie Schwirian, who would have been a potential defense witness did not disclose
her participation with and knowledge of the Defendant and some of the allegations being made against
him; the actions of now former AUSA Anna Forbes , who threatened to indict the Defendant's wife on
baseless allegations unless the Defendant agreed to allow her to reinstate and extend a tolling
agreement and make it retroactive to the already lapsed first tolling; why allegations that lapsed under
the first tolling were allowed to be introduced and placed upon the record of the PSR report; why AUSA
Forbes within days of the first indictment contacted defense counsel Mike Carey seeking to discuss her
personal employment issues; why a former AUSA, Mike Callaghan approached my counsel Mike
Chaney's Law Firm and delivered a threat that if I continued to talk to the government, "I would bury
myself in a hole that I could not climb out of." How did this former AUSA know about my confidential
reporting to the government of corruption by union leaders and construction contractors? Soon after
the threat, the union leaders and contractors formed a new Contractors Association board forced my
resignation and then fabricated false allegations to discredit me and cause what can only be described
as a malicious prosecution involving "unacceptable prosecution and investigative tactics" sufficient
alone to have the case dismissed.  Please invoke your authority to supervise the conduct of those
appearing before and in service to your Court to have an independent investigation of **prosecutorial and
investigative misconduct involving false, fabricated, perjured and coerced testimony.**  Please
specifically request that representations made by AUSA Hunter to defense counsel Ben Bailey, wherein
Hunter informed Bailey that the government would not seek forfeiture of assets was breached by
Hunter to threaten an innocent defendant into accepting a potential plea.  Please investigate why AUSA
Ryan informed defense counsel Rick Glaser, that the government would represent that the Defendant
did <u>not benefit</u> from the alleged credit loan disbursements, when just the contrary statement was made
to the PSR and appears in the non-relevant discussion to mislead the Court.  In summary, this entire
prosecution was false from the start and then once crossing the no return line, became an inappropriate
**"win at any cost and by any means"** pursuit by the investigators and government, concluding with the
invasion and search of the defendant's attorney-client protected case files.  As U.S. District Court Judge
Cormac said in <u>U.S. v. Ruehle</u>, "the defendant has only three witnesses to prove his innocence and the
government has intimidated and improperly influenced each one of them. Is this fair? Is this Justice? I
say Not." Judge Cormac granted the Motion to Dismiss the Indictment against Ruehle and I respectfully
request this consideration as well.  Defense evidence and witnesses can document multiple acts of
coercion and intimidation used by the government to induce and fabricate false testimony. A Special
Prosecutor is needed to interview the witnesses and review Defense counsel's statements from  a
recanting Grand Jury witness.  Please consider this Extraordinary request so that Justice and Truth will
finally be heard in my case.

Jonathan Steven Deutsch, *Pro se*

*Attachments:* **Exhibit 1** *(Government's MOI of SunTrust President David Sayre admitting former bank officers fabrication and forgery of the corporate resolution)*

> **Exhibit 2** *(Government's First Plea offer falsely inducing defendant to admit to the fabrication and forgery of the corporate resolution, when the Government knew or should have known the Bank had admitted their officers committed the fabrication and forgery)*

# WEST VIRGINIA HEAVY AND HIGHWAY AGREEMENT

## 2004 - 2006

between

## CONSTRUCTORS' LABOR COUNCIL OF WEST VIRGINIA, INC.

and

## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES

CONSTRUCTORS' LABOR COUNCIL
OF WEST VIRGINIA, INC.
Post Office Box 487
Charleston, West Virginia 25322-0487
Phone: (304) 343-6107
Fax: (304) 343-6108
Internet: www.wvclc.com



THIS AGREEMENT IS COPYRIGHT PROTECTED
AND MAY NOT BE REPRODUCED WITHOUT THE
EXPRESS WRITTEN PERMISSION OF
CONSTRUCTORS' LABOR COUNCIL OF WV, INC.

non-paid lunch. The second shift will consist of seven and one-half (7-1/2) hours work, plus one-half (1/2) hour for non-paid lunch. For the second shift, the Employee will receive eight (8) hours pay for (7-1/2) hours work. The third shift will consist of seven (7) hours work, plus one-half (1/2) hour for non-paid lunch. For the third shift, the Employee will receive eight (8) hours pay for (7) hours work.

(b) On triple shift operations, the normal workweek shall begin with the first shift Monday morning. All work performed between the beginning of the first shift Friday until the last shift Saturday shall be considered as worked on Friday and paid at the applicable rate for that day. All work performed between the beginning of the first shift Sunday until the beginning of the first shift on Monday, shall be considered as worked on Sunday and paid at the applicable rate for that day.

Section 4: 8 or 10-hour shifts. When two 8 or 10-hour shifts are established and operated, a one-half (2) hour free lunch period will be provided. Therefore, Employees will be on the project site for 8-1/2 hours or 10-1/2 hours, but will be paid only for 8 or 10 hours. In the event of the utilization by the Contractor of three shifts, the language provided in Section 3, Paragraph (a) of this Article will prevail.

Section 5: Overtime. The Employer shall determine when overtime shall be worked and by whom. The Employee shall not be required to working overtime unless detrimental to the construction project. Where Employees are required to work overtime beyond the normal shift, the first period shall consist of two (2) hours work, plus one-half (1/2) hour free lunch time and subsequent periods shall consist of three and one-half (3-1/2) hours work plus one-half (1/2) hour paid lunch time. If the Employee is required to work during any lunchtime, he shall be paid therefore. The Contractor will make every reasonable effort to provide some type of food during the second or third lunch periods.

Section 6: Show-up time. An Employee who reports for work at the regular starting time and for whom no work is provided shall receive pay equivalent to one (1) hour at the applicable hourly rate. The Employee must report to the Project at the regular starting time and remain available for work during the period compensated to be eligible to receive reporting pay. An Employee who is put to work shall be paid for actual hours worked but not less than two (2) hours. On Heavy construction projects with a gross contract value of $3,000,000.00 or more, an Employee who is put to work shall be paid for actual hours worked but not less than four (4) hours at the applicable hourly rate on eight (8) hour shifts and five (5) hours at the applicable hourly rate on ten (10) hour shifts.

Section 7: Weekly pay. Employees are to be paid weekly. The workweek shall begin with the daylight shift Monday and payment of wages shall be made no later than Friday of the following workweek. The Contractor and the Union shall mutually agree upon the day on which the Employees shall be paid. Employees who report for their paycheck on a day when there is no work scheduled because of weather or other causes shall not be eligible for reporting pay. All paychecks will be available at the start of the day shift on the established payday. The Employee may ask the Contractor to mail his check to his home on a non-work payday and the Contractor will mail said check prior to 12:00 noon on said day.

Section 8: Lunch Period. The Lunch period will be routinely held between 11:00 a.m. and 1:00 p.m. unless mutually agreed upon otherwise at the pre-job conference.

Section 9: Termination/lay-offs. An Employee whose employment is terminated or who is laid-off for the "convenience of the Employer" shall be paid within one (1) hour of the time of termination or at the end of the shift, whichever is first, unless extraordinary circumstances prevent the timely preparation of a final check. Absent extraordinary circumstances, the Employee shall be paid at the straight time rate if he is required to wait beyond such period. However, in no event shall the Employee be paid for more than eight (8) hours per day that he is required to wait. An Employee whose work is terminated shall be given sufficient time in which to gather his personal belongings and tools.

Section 10:   West Virginia Heavy and Highway Construction Industry Fund. Contractors, both signatory and non-signatory members of the Constructors' Labor Council of West Virginia, Inc., shall pay into the West Virginia Heavy and Highway Construction Industry Fund

12

13

(WV H/H CIF) fifteen cents ($0.15) per hour for each and every hour worked by Employees covered by this Agreement for all construction work performed in all counties in the State of West Virginia. Remittance, with a copy of the West Virginia Heavy and Highway Construction Industry Fund form, shall be forwarded to the West Virginia Heavy and Highway Construction Industry Fund, Post Office Box 487, Charleston, West Virginia, 25322-0487. It is further understood and agreed that if any Contractor shall remit the above-referenced fifteen cents ($0.15) to any Union, the Union shall retain the entire amount paid in trust for the West Virginia Heavy and Highway Construction Industry Fund and the Union shall provide an accounting for all such receipts and immediately forward said receipts to the West Virginia Heavy and Highway Construction Industry Fund.

### ARTICLE V
### Holidays

Section 1: Holiday days. New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and the day after Thanksgiving Day, and Christmas Day shall be holidays. There shall be no work for Employees on Labor Day, Christmas Day, or Easter Sunday, except in cases of emergency. On holidays and Easter Sunday, the rate of pay shall be twice the regular rate and on such days not less than four (4) consecutive hours of work shall be given. When a holiday falls on Sunday, the following Monday shall be observed as the holiday. It is understood that on eight (8) hour shifts, holidays celebrated on Mondays through Fridays that are not worked, eight (8) hours shall be counted in the computation of hours worked for overtime purposes only. It is understood that on ten (10) hour shifts, holidays celebrated on Mondays through Fridays that are not worked, ten (10) hours shall be counted in the computation of hours worked for overtime purposes only. There shall be no paid non-working holidays. In case of a conflict between the National and State designation of a holiday, the State designation shall be applicable.

Section 2: Holiday time. Thanksgiving holiday shall begin at 12:01 a.m. on Thanksgiving Day and end at 12:00 p.m. midnight on the day after Thanksgiving Day. Christmas holidays shall begin at 12:01 a.m. and end at 12:00 p.m. midnight. All other holidays will be observed starting at the beginning of the first shift on the holiday and ending twenty-four (24) hours later.

Section 3: Emergency work. Emergency work shall be that work necessary to save life or property.

### ARTICLE VI
### The Contract

Section 1: Amendment to contract. This Agreement may be amended by mutual consent of the Constructor's Labor Council of West Virginia, Inc., as bargaining representative of the Employer members, and the Union's business manager, as the bargaining representative of the Employees. Such amendments shall be reduced to writing and made available to all Contractor members. It is understood and agreed that if the Union enters into any agreement with any construction Contractor that contains terms, conditions, wages, benefits or other provisions more favorable than the provisions set forth in this Heavy and Highway Agreement, the Contractors signatory hereto shall immediately have the benefit of and be entitled to rely upon and enforce each and every more favorable term, condition, wage, benefit or provision. Should the Constructors' Labor Council of West Virginia, Inc., or any of its Contractors working under the terms and conditions of this Collective Bargaining Agreement provide any other signatory craft with hours or working conditions more favorable than those received by the Union Employees, then such items and conditions shall be available to the members of the Union.

The parties hereto agree to meet monthly, or as necessary, to evaluate past projects bid and pending projects to be bid by pre-bid and/or pre-job conferences, for the purpose of determining the impact of such adjustments and the need for competitive adjustments to the wages, hours and working conditions herein established.

Section 2: Wage freeze. The Contractor and Union may agree, in writing, that the hourly wage rates and fringe benefits in effect on the bid date will prevail for an agreed upon period of time from the date of the "Notice to Proceed." In any event, on all construction work performed under this Agreement on construction projects not to exceed $3,000,000.00 the hourly wage rates and fringe benefits in effect on the bid date shall prevail for a period of

14

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 2:10-00160

JONATHAN STEVEN DEUTSCH

STIPULATION OF FACTS

The United States and Jonathan Steven Deutsch ("Mr. Deutsch")
stipulate and agree that the facts comprising the offense of
conviction in the Information in the Southern District of West
Virginia, Criminal No. 2:10-00160, include the following:

1.    In 2004, Mr. Deutsch was the Executive Secretary of the
Constructors' Labor Council of West Virginia, Inc. and its related
trust fund, the West Virginia Heavy & Highway Construction Industry
Fund ("CIF").

2.    On behalf of CIF, Mr. Deutsch applied for a $120,000
commercial loan from National Bank of Commerce ("the Bank"), now
SunTrust bank, in Charleston, Kanawha County, West Virginia.

3.    As part of that loan application process, Mr. Deutsch was
required to provide to the Bank a Certified Corporate Resolution
regarding his authority to apply for that loan signed by two CIF
officers.  The Resolution that Mr. Deutsch presented to the Bank on
or about August 19, 2004, was false and fictitious because it
represented that his wife, Patty Deutsch, was Treasurer of CIF,
although Mr. Deutsch knew that the CIF board had never elected her
to that office and knew she lacked the legal authority to sign the
Resolution in that capacity.

4.    The Bank relied upon that Resolution and approved the
$120,000 loan to CIF.

5.    Mr. Deutsch is aware that at the time he provided that
Resolution to the Bank, the accounts of the Bank were insured by
the Federal Deposit Insurance Corporation.

This Stipulation of Facts does not contain each and every fact
known to Mr. Deutsch and to the United States concerning his
involvement and the involvement of others in the charges set forth

PLEA AGREEMENT EXHIBIT B



U.S. Department of Justice

*United States Attorney*
*Southern District of West Virginia*

---

| *United States Courthouse* | *Mailing Address* |
|---|---|
| *300 Virginia Street East* | *Post Office Box 1713* |
| *Charleston, WV 25301* | *Charleston, WV 25326* |
| FAX: (304) 347-5104 | *(304) 345-2200* |
| | *1-800-659-8726* |

March 2, 2011

Richard S. Glaser, Jr.
Three Wells Fargo Center
401 South Tryon Street
Suite 3000
Charlotte, NC 28202

      Re:  United States v. Jonathan Steven Deutsch
            Criminal No. 2:10-00160 (USDC SDWV)

Dear Mr. Glaser:

      This will confirm our conversations with regard to your client Jonathan Steven Deutsch (hereinafter "Mr. Deutsch"). As a result of these conversations, it is agreed by and between the United States and Mr. Deutsch as follows:

      1.   PENDING CHARGES. Mr. Deutsch is charged in a thirty-two count superseding indictment as follows:

      (a)  Counts One through Twenty-Five charge Mr. Deutsch with violations of 18 U.S.C. § 1341 (wire fraud); and

      (b)  Counts Twenty-Six through Thirty-Two charge Mr. Deutsch with violations of 18 U.S.C. § 1343 (mail fraud).

      2.   CHARGING AGREEMENT. Mr. Deutsch agrees to waive his right pursuant to Rule 7 of the Federal Rules of Criminal Procedure to be charged by indictment and will consent to the filing of a single-count information to be filed in the United States District Court for the Southern District of West Virginia, a copy of which is attached hereto as "Plea Agreement Exhibit A."

      3.   RESOLUTION OF CHARGES. Mr. Deutsch will plead guilty to a violation of 18 U.S.C. § 1014 (false statement to a financial institution) as charged in said information. Following final

                                        Defendant's
                                        Inititals

in the Information, and is set forth for the limited purpose of establishing a factual basis for the defendant's guilty plea.

Stipulated and agreed to:


_____        _____
JONATHAN S. DEUTSCH                      Date
Defendant


_____        _____
RICHARD S. GLASER JR.                    Date
Counsel for Defendant


_____        _____
THOMAS C. RYAN                           Date
Assistant United States Attorney


PLEA AGREEMENT EXHIBIT B



| U.S. DEPARTMENT OF LABOR OFFICE OF LABOR-MANAGEMENT STANDARDS | REPORT OF INTERVIEW |
|---|---|

David L. SAYRE, City President for SunTrust Bank West Virginia, 300 Capitol Street, Charleston, WV 25301, 304-340-4412, provided the following information when interviewed by Stephen L. WILBURN, Special Agent, US Department of Labor, Office of Inspector General for Investigations, and Joseph HARRILLA, Criminal Investigator, US Department of Labor, Office of Labor Management Standards. Gerald BINGEMAN, Corporate Security for SunTrust Bank, 10 Franklin Road, SE, Roanoke, VA 24011, 540-982-3331, also attended portions of the interview and provided the information as noted. SAYER and BINGEMAN were advised that they were being interviewed pursuant to an investigation of the Operators Labor Management Cooperative Trust (OLMC), Constructors' Labor Council (CLC), West Virginia Heavy and Highway Construction Industry Fund (WVHH), and the activities of Jonathan S. DEUTSCH.

SAYRE began working at SunTrust Bank of West Virginia on October 11, 2005. He is responsible for taking care of commercial loans for high profile clients. He was previously employed by 5/3 Bank for approximately three years and United Bank for approximately 10 years.

The banks in the Charleston area focus on unions because they bring in a lot of potential business from their membership. DEUTSCH was considered a high profile client because of his union contacts.

SAYRE confirmed that the line of credit was originally set up by Joe STARCHER, who was the Vice President of National Bank of Commerce (NBC), in August 2004. Prior to SAYRE taking over, it was discovered that STARCHER had forged signatures on various loan documents, including the line of credit for the WVHH. Specifically, SAYRE stated that STARCHER forged DEUTSCH's signature on the document listing DUETSCH as the personal guarantor of the line of credit, and on the Certified Corporate Resolution dated August 14, 2004. SAYRE deferred specific questions about the forgeries to BINGMAN, since he investigated the matter, and the alleged activities took place prior to SAYRE's employment at SunTrust.

After SunTrust took over NBC, BINGEMAN investigated allegations that STARCHER and President Rick WHISNER had forged documents relating to various loans. BINGEMAN found that STARCHER forged signatures on documents relating to 24 loans. Additionally, it was discovered that WHISNER also forged signatures on loan documents. STARCHER confessed to forging signatures on loan documents, to include the documents involving the WVHH line of credit. BINGEMAN stated DEUTSCH was adamant that he did not sign the documents, but refused to sign an affidavit because he was friends with STARCHER and did not want to get him in trouble. Besides DEUTSCH, there was only one other customer who refused to sign an affidavit. BINGEMAN agreed to provide copies of his investigation.

The case was turned over to the FBI, but the Department of Justice did not take action because there was no financial loss to the bank. SunTrust renewed all the loans, including the line of credit for the WVHH.

Interview Date: June 15, 2009

Date Prepared: June 17, 2009

Interview Location: SunTrust Business Office, 300 Capitol Street, Charleston, WV

By: Investigator Joseph M. Harrilla

Case File: 150-09991(08)

This document is the property of the Office of Labor-Management Standards and is not to be disclosed to unauthorized persons.

OLMS-12
October 2003

MOI-0181

RI – David Sayre and Gerald Bingeman
June 15, 2009
Page 2 of 2

WHISNER and STARCHER's employment was terminated shortly after the allegations were uncovered. WHISNER is currently employed as the President of BB&T Bank in Charleston and STARCHER is employed by Countrywide Mortgage.

Commercial lines of credit require annual renewals. Shortly after SAYRE began working for SunTrust, DEUTSCH was one of the first people he met with to renew the WVHH commercial line of credit. SAYRE noted that the application was missing several documents such as the trust agreement, meeting minutes, and tax returns. At that time, SAYRE did not review the file dating back to 2004 because he assumed all the documents had been submitted with the original application.

Another problem was DEUTSCH withdrew most of the credit limit when the account was opened, and was not paying down on the principle. DEUTSCH eventually provided copies of the WVHH tax returns to SAYRE. Although the WVHH did not have good years financially, DEUTSCH showed SAYRE a yellow book, which SAYRE believes was a collective bargaining agreement, that said the WVHH was to receive $0.15 per man-hour worked. SAYRE knew there were two large federally funded projects to include a bridge construction and a lock and dam project, so he recommended approving the line of credit.

When reviewing approval for a commercial loan or line of credit, SAYRE stated the most reliable document is the tax return because they are filed with the IRS. SAYRE did not know if the WVHH tax return (Form 990) was accurate.

SAYRE did not know how the WVHH used the funds from the line of credit. SAYRE stated that all funds should have gone into a business account belonging to the WVHH and not transferred directly into a personal account.

In May 2007, four representatives from the WVHH came to SunTrust and informed SAYRE that DEUTSCH had resigned and provided him with a revised trust agreement that appointed new trustees. They wanted DEUTSCH removed from all the accounts belonging to the WVHH. SAYRE had a meeting with DEUTSCH scheduled the next day to renew the line of credit. *(At the end of the interview, SAYRE provided a copy of an e-mail he created indicating that he met with the WVHH representatives on May 16, 2007 and DEUTSCH on morning of May 17, 2007.)*

The new trustees claimed that DEUTSCH had no authority to open the line of credit for the WVHH. Based on the trustees' allegations and the fact that STARCHER had admittedly falsified documents, SunTrust wrote off the line of credit. SAYRE indicated that SunTrust froze all of DEUTSCH's accounts, to include accounts belonging to his daughter.

MOI-0182

Jonathan Deutsch
P.O. Box 75302
Charleston, WV 25375

**SunTrust Banks, Inc.**
NATIONAL BANK OF COMMERCE
300XXCAPITAL ST
CHARLESTON WV 25301

Loan Number _____
Date May 1, 2003
Maturity Date May 1, 2018
Loan Amount $ 300,000.00
Renewal Of _____

BORROWER'S NAME AND ADDRESS
"I" includes each borrower above, joint and severally.

LENDER'S NAME AND ADDRESS
"You" means the lender, its successors and assigns.

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of __Three Hundred Thousand__ __and 00/100 Dollars**********************************__ Dollars $ 300,000.00

☐ **Single Advance:** I will receive all of this principal sum on _____. No additional advances are contemplated under this note.
☒ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
   **Conditions:** The conditions for future advances are verbal or written requests _____
   _____
   _____

☒ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to all other
   conditions and expires on February 1, 2004 _____.
☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).
INTEREST: I agree to pay interest on the outstanding principal balance from May 1, 2003 _____ at the rate of _____ 4.0 %
per year until paid in full _____.
☒ **Variable Rate:** This rate may then change as stated below.
   ☒ **Index Rate:** The future rate will be 1/4 of 1% below _____ the following index rate: National Bank of Commerce
      Prime Rate

   ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
   ☒ **Frequency and Timing:** The rate on this note may change as often as daily
      A change in the interest rate will take effect the day following a change in the index rate
   ☒ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ 6.5 % or less than
      3.75 %. The rate may not change more than _____ % each _____.
   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   ☒ The amount of each scheduled payment will change.       ☐ The amount of the final payment will change.

ACCRUAL METHOD: Interest will be calculated on an actual 365-day _____ basis.
POST MATURITY RATE: I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
   ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
   ☐ at a rate equal to _____
☒ LATE CHARGE: If a payment is made more than ____10____ days after it is due, I agree to pay a late charge of 5% of the scheduled
   payment not to exceed $100.00
☐ ADDITIONAL CHARGES: In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount above:

PAYMENTS: I agree to pay this note as follows:
☒ **Interest:** I agree to pay accrued interest monthly beginning 6-1-03, 7-1-03, 8-1-03, 9-1-03, 10-1-03, 11-1-03
   12-1-03, 1-1-04, 2-1-04. Converting to principal & interest payments on 3-1-04 as described
   below
☐ **Principal:** I agree to pay the principal _____

☒ **Installments:** I agree to pay this note in ____170____ payments. The first payment will be in the amount of $ 2,500.00
   and will be due March 1, 2004 _____. A payment of $ 2,500.00 will be due _____
   on the 1st day of each month _____ thereafter. The final payment of the entire
   unpaid balance of principal and interest will be due at maturity _____.
☐ THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS:
   ☐ AN INSTALLMENT OF $ _____ WILL BE DUE ON _____
   ☐ LARGER INSTALLMENTS WILL BE DUE AS FOLLOWS: (Amounts and Due Dates) _____
   _____

PURPOSE: The purpose of this loan is to construct a personal residence _____
ADDITIONAL TERMS:



**Property Insurance:** If property insurance is required by any agreement securing this note, I may obtain property insurance from anyone I want that is
acceptable to you. If I get the insurance from or through you I will pay _____ for _____ of coverage.
**Security Interest:** I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or
in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs,
replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or
performance of the Property, "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights
and claims arising from the Property; and any collections and distributions on account of the Property.

☐ **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for
   property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or
   agreement against any account debtor or obligor.

☐ **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials,
   work in process, or materials used or consumed in my business.

☐ **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and
   equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule
   I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☐ **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that

[X] **Interest:** I agree to pay interest on the unpaid principal balance at _____ payment in the amount of $ 2,500.00 monthly beginning on _____ 12-1-03, 1-1-04, 2-1-04. Converting to principal & interest payments on 3-1-04 as described below

[ ] **Principal:** I agree to pay the principal _____

[X] **Installments:** I agree to pay this note in ___170___ payments. The first payment will be in the amount of $ _2,500.00_
and will be due __March 1, 2004_____. A payment of $ 2,500.00_____ will be due _____
on the 1st day of each month_____ thereafter. The final payment of the entire
unpaid balance of principal and interest will be due _at maturity_____.

[ ] THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS:
  [ ] AN INSTALLMENT OF $ _____ WILL BE DUE ON _____
  [ ] LARGER INSTALLMENTS WILL BE DUE AS FOLLOWS: (Amounts and Due Dates) _____

**PURPOSE:** The purpose of this loan is _to construct a personal residence_____
**ADDITIONAL TERMS:**

**Property Insurance:** If property insurance is required by any agreement securing this note, I may obtain property insurance from anyone I want that is acceptable to you. If I get the insurance from or through you I will pay _____ for _____ of coverage.

**Security Interest.** I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

[ ] **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor.

[ ] **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

[ ] **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

[ ] **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

[ ] **General Intangibles:** All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

[ ] **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

[ ] **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

[ ] **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

[ ] **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

[ ] **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

[X] **Specific Property Description:** The Property includes, but is not limited by, the following:
1st Lien Deed of Trust on real property and improvements located at Lot 16,
Jamestown Subdivion, Charleston, WV 25314

If this agreement covers timber to be cut, enter real estate description and record owner information:

The Property will be used for a [ ] personal [ ] business [ ] agricultural _____ purpose.
[ ] If checked, this loan is subject to the West Virginia Consumer Credit and Protection Act.
Borrower/Owner State of organization/registration (if applicable) _____

**SIGNATURES:** I AGREE TO THE TERMS OF THIS AGREEMENT
(INCLUDING THOSE ON PAGE 2). I have received a copy on today's date.

_Jonathan S. Deutsch_

Signature for Lender

_Joe A. Starcher, Jr._ _Assistant Vice President_

UNIVERSAL NOTE AND SECURITY AGREEMENT
Experts © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-WV 12/18/2000

(page 1 of 2)

Notice of Intent to Forfeit Substitute Assets Issue

In the March 23, 2011 Grand Jury Transcript at page 35, line 8, Department of Labor Agent Wilburn is asked the following question by AUSA Hunter Smith:

"So much of the money that he took from the company, in your analysis, went to the construction of the house?" Agent Wilburn replies, "Yes."

An unidentified Grand Jury member then asks, "Was the house built with an ongoing construction loan?" Agent Wilburn replies, "That I don't know." AUSA Smith then poses the question to Agent Wilburn, "You didn't find that loan, did you?" Agent Wilburn replies, "No."

The significance of this testimony is huge. AUSA Smith and Agent Wilburn are falsely alleging that the house was built with "company" funds since no construction loan was involved.  Their discussion is as misleading to the Grand Jury as it is false.  Attached please find a true and original copy of the "construction loan" that AUSA Smith and Agent Wilburn allege was not found.  The house was constructed in 2003 from the proceeds of the construction loan ($300,000) and an additional ($275,000) received by Patty upon the sale of her house.  In other words, the house was constructed with personal funds and not "company" money.  The Grand Jury was deliberately or negligently misled! Furthermore, I had received the probate distribution from my mother's estate of ½ of $1.4 million one year earlier. Mike Chaney was her estate probate attorney.  I have attached documentation of this inheritance.  The house was constructed for $500,000, an amount equal to the Zurich Insurance required by and provided to the bank to secure the construction loan.  Please also see attached construction insurance policy declarations page.

 In summary, I did not use "company" funds on the house.  I used my personal American Express Card for building materials from Lowes, etc., but I also used my AMEX Card to advance ongoing company conferences and operational expenses.  AUSA Smith and Agent Wilburn mislead the Grand Jury by suggesting that reimbursements to my AMEX Card for "company" expenses (mostly conferences) were payments for house construction materials.

Permit me to also note that Rick Glaser and then AUSA Booth Goodwin in 2009 entered into a tolling agreement that AUSA Goodwin allowed to lapse without filing charges.  The tolling agreement was for the period of 2000 to October2005.  It appears that AUSA Smith did not get the memo of the tolling agreement, as his forfeiture effort violates the spirit and letter of that tolling agreement.  Equally important, the testimony provided by and between AUSA Smith and Agent Wilburn relating to the funding for the house construction is documented to be false.  With diligence, Agent Wilburn would have and should have learned from the bank that a construction loan was used.  Did the bank fail to provide the documentation or did Agent Wilburn not ask?  In either case the Grand Jury was misled into approving the forfeiture on negligent or deliberate false testimony.

Form **706**

(Rev. July 1998)

Department of the Treasury
Internal Revenue Service

## United States Estate (and Generation-Skipping Transfer)
## Tax Return

Estate of a citizen or resident of the United States (see separate instructions). To be filed for decedents dying after December 31, 1997, and before January 1, 1999.
For Paperwork Reduction Act Notice, see page 1 of the separate instructions.

OMB No. 1545-0015

| | | | |
|---|---|---|---|
| 1a Decedent's first name and middle initial (and maiden name, if any) **Sallee B.** | 1b Decedent's last name **Deutsch** | | 2 Decedent's social security no. [redacted] |
| 3a Legal residence (domicile) at time of death (county, state, and ZIP, or foreign country) **Charleston, West Virginia** | 3b Year domicile established **1950** | **WV** | 4 Date of birth [redacted] | 5 Date of death **7/10/98** |
| 6a Name of executor (see page 2 of the instructions) **Roxann D. Garber** | 6b Executor's address (number and street including apartment or suite no. or rural route; city, town, or post office; state; and ZIP code) **490 Forest Valley Road Atlanta, GA 30342** |
| 6c Executor's social security number (see page 2 of the instructions) [redacted] | |
| 7a Name and location of court where will was probated or estate administered **Kanawha County Commission** | 7b Case number **None** |
| 8 If decedent died testate, check here ▶ ☐ and attach a certified copy of the will. | 9 If Form 4768 is attached, check here ▶ ☐ |
| 10 If Schedule R-1 is attached, check here ▶ ☐ | |

**DECEDENT AND EXECUTOR — PART I**

**PART 2 — TAX COMPUTATION**

| | | | |
|---|---|---|---|
| 1 | Total gross estate less exclusion (from Part 5, Recapitulation, page 3, item 12). . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1,442,639 |
| 2 | Total allowable deductions (from Part 5, Recapitulation, page 3, item 23). . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 78,010 |
| 3 | Taxable estate (subtract line 2 from line 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 1,364,629 |
| 4 | Adjusted taxable gifts (total taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts that are includible in decedent's gross estate (section 2001(b)) . . . . . . . . . | 4 | |
| 5 | Add lines 3 and 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 1,364,629 |
| 6 | Tentative tax on the amount on line 5 from Table A on page 10 of the instructions . . . . . . . . . . . . . . . . . . . | 6 | 497,590 |
| 7a | If line 5 exceeds $10,000,000, enter the lesser of line 5 or $17,184,000. If line 5 is $10,000,000 or less, skip lines 7a and 7b and enter -0- on line 7c. . . . . . . . . | 7a | | |
| b | Subtract $10,000,000 from line 7a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7b | | |
| c | Enter 5% (.05) of line 7b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7c | |
| 8 | Total tentative tax (add lines 6 and 7c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 497,590 |
| 9 | Total gift tax payable with respect to gifts made by the decedent after December 31, 1976. Include gift taxes by the decedent's spouse for such spouse's share of split gifts (section 2513) only if the decedent was the donor of these gifts and they are includible in the decedent's gross estate (see instructions) . . . . . . . . . . . . . | 9 | |
| 10 | Gross estate tax (subtract line 9 from line 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 497,590 |
| 11 | Maximum unified credit against estate tax . . . . . . . . . . . . . | 11 | 202,050 | |
| 12 | Adjustment to unified credit. (This adjustment may not exceed $6,000. See page 7 of the instructions.) . . . . . . . . . . . . . . . . . . . . . . . . | 12 | | |
| 13 | Allowable unified credit (subtract line 12 from line 11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 202,050 |
| 14 | Subtract line 13 from line 10 (but do not enter less than zero). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 295,540 |
| 15 | Credit for state death taxes. Do not enter more than line 14. Figure the credit by using the amount on line 3 less $60,000. See Table B in the instructions and attach credit evidence (see instructions). . . . . . . . . | 15 | 55,736 |
| 16 | Subtract line 15 from line 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 239,804 |
| 17 | Credit for Federal gift taxes on pre-1977 gifts (section 2012) (att. computation) . . | 17 | | |
| 18 | Credit for foreign death taxes (from Schedule(s) P). (Attach Form(s) 706CE) . . | 18 | | |
| 19 | Credit for tax on prior transfers (from Schedule Q) . . . . . . . . . . | 19 | | |
| 20 | Total (add lines 17, 18, and 19). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 | |
| 21 | Net estate tax (subtract line 20 from line 16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | 239,804 |
| 22 | Generation-skipping transfer taxes (from Schedule R, Part 2, line 10) . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | |
| 23 | Total transfer taxes (add lines 21 and 22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | 239,804 |
| 24 | Prior payments. Explain in an attached statement . . . . . . . . . . . . . . . . . . | 24 | | |
| 25 | United States Treasury bonds redeemed in payment of estate tax . . . . . . . . . | 25 | | |
| 26 | Total (add lines 24 and 25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | |
| 27 | Balance due (or overpayment) (subtract line 26 from line 23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 | 239,804 |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer other than the executor is based on all information of which preparer has any knowledge.

*Roxann D. Garber, Executrix for the Estate of Sallee B. Deutsch* 4/6/99

Signature(s) of executor(s) — Date

Signature of preparer other than executor — KFA

Verner, Perling & Conrad, P.C.
201 Allen Road Suite 310
Atlanta, GA 30328

Address (and ZIP code) — Date 4/5/99

06 (Rev. 7–98)

ate of: Sallee B. Deutsch

## Part 3. – Elections by the Executor

|  | Yes | No |
|---|---|---|
| Please check the "Yes" or "No" box for each question. (See instructions beginning on page 3.) | | |
| 1  Do you elect alternate valuation? | | X |
| 2  Do you elect special use valuation? | | X |
|    If "Yes," you must complete and attach Schedule A–1 | | |
| 3  Do you elect to pay the taxes in installments as described in section 6166? | | X |
|    If "Yes," you must attach the additional information described on page 5 of the instructions. | | |
| 4  Do you elect to postpone the part of the taxes attributable to a reversionary or remainder interest as described in section 6163? | | X |

## Part 4. – General Information
(Note:  Please attach the necessary supplemental documents. You must attach the death certificate.)
(See Instructions beginning on page 6.)

Authorization to receive  confidential tax information under Regulations section 601.504(b)(2)(i), to act as the estate's representative before the Internal Revenue Service, and to make written or oral presentations on behalf of the estate if return prepared by an attorney, accountant, or enrolled agent for the executor.

| Name of representative (print or type) | State | Address (number, street, and room or suite no., city, state, and ZIP code) |
|---|---|---|
| Michael G. Verner, CPA | GA | 201 Allen Road Suite 310<br>Atlanta, GA  30328 |

I declare that I am the ☐ attorney/ ☒ certified public accountant/ ☐ enrolled agent (you must check the applicable box for the executor and prepared this return for the executor. I am not under suspension or disbarment from practice before the Internal Revenue Service and am qualified to practice in the state shown above.

| Signature | CAF number | Date | Telephone number |
|---|---|---|---|
| [signature] | 6500-21281R | 4/3/99 | 404-256-6444 |

1  Death certificate number and issuing authority (attach a copy of the death certificate to this return).
WV Dept. of Health & Human Resources

2  Decedent's business or occupation. If retired, check here ► ☐ and state decedent's former business or occupation.
Homemaker

3  Marital status of the decedent at time of death:
☐ Married
☒ Widow or widower – Name, SSN, and date of death of deceased spouse ► Stanley Edwin Deutsch ▬▬▬▬▬▬▬

☐ Single
☐ Legally separated
☐ Divorced – Date divorce decree became final ►

| 4a  Surviving spouse's name | 4b  Social security number | 4c  Amount received (see pg. 6 of instr.) |
|---|---|---|
| None | | |

5  Individuals (other than the surviving spouse), trusts, or other estates who receive benefits from the estate (do not include charitable beneficiaries shown in Schedule O) (see instructions). For Privacy Act Notice (applicable to individual beneficiaries only), see the Instructions for Form 1040.

| Name of individual, trust, or estate receiving $5,000 or more | Identifying number | Relationship to decedent | Amount (see instructions) |
|---|---|---|---|
| Roxann D. Garber | | Daughter | 534,551 |
| Jonathan Steven Deutsch | | Son | 534,538 |

All unascertainable beneficiaries and those who receive less than $5,000 ................................ ►

| Total | 1,069,089 |
|---|---|

|  | Yes | No |
|---|---|---|
| Please check the "Yes" or "No" box for each question. | | |
| 6  Does the gross estate contain any section 2044 property (qualified terminable interest property (QTIP) from a prior gift or estate) (see page 6 of the instructions)? | | X |

(continued on next page)

*TO: JOE FARABEE & NANCY*
*FROM: JON + PATTY DEUTSCH*
*DATE: AUGUST 27, 2003*

**INLAND MARINE DECLARATIONS**

**ZURICH**

ASSURANCE COMPANY OF AMERICA
NEW YORK, NEW YORK 10038
A Stock Company

Inland Marine Declarations are ~~...~~ if any, issued to form a ~~...~~, completes the Commercial ~~...~~ Policy numbered as follows: ████0911

☐ New Policy
Renewal of _____
Rewrite of _____

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.
THIS IS A COINSURANCE CONTRACT. Please read your policy.

**1. Named Insured and Mailing Address:**
JOHN & PATTY DEUTSCH
P O BOX 75302
CHARLESTON, WV 25375

**3. Policy Period – From Effective Date Of:** 08 / 08 / 2003
to (check one): ☐ Continuous Reporting  ☒ One Year From Effective Date
12:01 a.m. Standard Time at your mailing address above.

**2. Producer Information (complete A-E)**
A) Name:
SILVERSTEIN, MADDOX, WALLACE
P O BOX 3304
CHARLESTON, WV 25333
B) Telephone #: 304 343-9518
C) Fax #: 304 343-0513
D) Zurich Producer #: 02355352
E) Field Office Name: PITTSBURGH
F) Field Office Code: 35

**4. Form of Business:** ☒ Individual  ☐ Partnership  ☐ Corporation  ☐ Joint Venture  ☐ Other
**5. Limits of Insurance** (select *either* One-Shot or Reporting Form option below):

☐ Reporting Form (continuous policy)

☐ Annual Rate  ☐ Monthly Rate (HBIS-4)
☐ Including Existing Building or Structure (HBIS-37)

| | |
|---|---|
| A) Any one structure* | $ 3,000,000 |
| B) Property temporarily at any other premises | $ 10,000 |
| C) Property in transit | $ 25,000 |
| D) All covered property at all locations | $ 5,000,000 |
| E) Development/Subdivision Fences/Walls or Signs | Per Report |
| F) Rate | Per Report |
| G) Premium | Per Report |
| H) Tax (applicable in KY only) | Per Report |
| I) Total Fully Earned Policy Premium | Per Report |
| * Subject to underwriting guidelines | |

☒ One-Shot (non-reporting form/single structure policy) HBIS-1
☒ 1-12 Family Dwelling  ☐ Commercial Structure
☐ Including Existing Building or Structure (HBIS-37)
Property Location 81 SALEM ROAD, JAMESTOWN SUBDIVISION
CHARLESTON, WV 25314

| | |
|---|---|
| A) Any one structure | $ 500,000 |
| B) Property temporarily at any other premises | $ 10,000 |
| C) Property in transit | $ 25,000 |
| D) All covered property at all locations (same as A unless otherwise noted) | $ 500,000 |
| E) Development/Subdivision Fences/Walls or Signs | $ 0 |
| F) Rate | 0.23 |
| G) Premium | $ 1,150.00 |
| H) Tax (applicable in KY only) | $ 0.00 |
| I) Total Fully Earned Policy Premium (minimum premium applicable) | $ 1,150.00 |

**6. Deductible** (minimum $500 unless otherwise indicated): ☒ $1,000  ☐ $2,500  ☐ $5,000  ☐ Other _____

**7. Forms Applicable To All Coverage Parts:**
☒ 40471  Builders Risk Coverage Form
☒ 47681  Comm. Inland Marine Coverage Part
☒ CM0001  Comm. Inland Marine Conditions
☒ IL0017  Common Policy Conditions (IL0146 in WA)
☐ HBIS-58  Development/Subdivision Walls/Fences/Signs
☐ 9H0003  Florida Builders Risk Declarations
☐ HBIS-35  Windstorm or Hail Exclusion
☐ HBIS-37  Existing Building(s) or Structure(s)

☐ HBIS-42  Florida Fraud Statement
☐ HBIS-43  Windstorm Percentage Deductible
☐ HBIS-44  New York Fraud Statement
Other Forms: (list other applicable state and/or HBIS forms; all required state forms applicable)
IL0281, CM0106, U-GU-630-A
_____

Countersigned: 8/23/03
Date
By: _____
Authorized Representative

FM 170001 Rev. 07/00

INSURED COPY     MORTGAGEES COPY     AGENT COPY     BUILDERS RISK PLAN COPY

082708_PM_EP14F OCT 2008

# PRIORITY MAIL®
UNITED STATES POSTAL SERVICE

Any amount of mailable material may be enclosed, as long as the envelope is not modified, and the contents are entirely confined within the envelope with the adhesive provided as the means of closure.

INTERNATIONAL RESTRICTIONS APPLY:

4-POUND WEIGHT LIMIT ON INTERNATIONAL APPLIES

Customs forms are required. Consult the International Mail Manual (IMM) at pe.usps.gov or ask a retail associate for details.

Please recycle.

Visit us at usps.com

*HAND DELIVER TO LAW CLERK*

Mailing Envelope
For Domestic and International Use

THOMAS E. JOHNSTON
United States District Judge

UNITED STATES DISTRICT COURT
Southern District of West Virginia
Robert C. Byrd United States Courthouse
300 Virginia Street, East, Room 6610
Charleston, West Virginia 25301

Country of Destination/Pays de destination:







EP14F

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; Oct. 2008; All rights reserved.